54 F.3d 786
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 The PEOPLE OF the TERRITORY OF GUAM, Plaintiff-Appellant,
v.
Henry Babauta SANTOS, Defendant-Appellee.
 No. 94-10347.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 4, 1995.
Decided May 17, 1995.
 
 1
 Before: PREGERSON, KOZINSKI, and HAWKINS, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 The government of the Territory of Guam appeals the decision of the Appellate Division of the United States District Court for the District of Guam, which reversed and remanded for a new trial the conviction of Henry Babauta Santos because he was denied effective assistance of counsel. We have jurisdiction over this appeal under 42 U.S.C. Sec. 1424-3(c). We affirm.
 
 I. BACKGROUND
 A. PROCEDURAL HISTORY
 
 4
 After a jury trial in the Superior Court for the Territory of Guam, Santos was convicted of two counts of aggravated murder, one count of robbery, and two counts of the use of a deadly weapon during the commission of a felony. Santos's trial counsel filed a motion for a new trial, alleging that the prosecutor committed misconduct during the government's closing argument. Santos's trial counsel later supplemented the new trial motion alleging his own ineffectiveness as counsel because of his failure to investigate a possible defense. The trial court denied the new trial motion, ruling that although counsel's performance was deficient, and thus met the first prong of the Strickland v. Washington test, 466 U.S. 668, 687 (1984), there was a failure to show that Santos was prejudiced by this defective performance. As to Santos's allegation of prosecutorial misconduct, the court ruled that its curative admonition to the jury neutralized any prejudice caused by the prosecutor's inappropriate remarks.
 
 
 5
 Santos was then sentenced to two terms of life imprisonment without possibility of parole for the murder counts, plus two consecutive twenty year terms for the use of a deadly weapon counts, and an additional twenty year term for the robbery count.
 
 
 6
 Santos appealed and argued that the trial court erred in denying the claims of prosecutorial misconduct and ineffective assistance of counsel he had alleged in his motion for a new trial. In addition, Santos claimed on appeal that the trial court gave an erroneous reasonable doubt instruction.
 
 
 7
 The Appellate Division of the District Court of Guam reversed and remanded his conviction based solely on our earlier reversal of a Guam case involving a similar nonstatutory reasonable doubt instruction. The government of Guam appealed that ruling to this court, and we reversed the Appellate Division, and reinstated Santos's conviction. People of the Territory of Guam v. Borja, 983 F.2d 914 (9th Cir. 1992) (nonstatutory reasonable doubt instructions given in four unrelated cases in Guam not plain error, because instructions adequately conveyed the degree of doubt required for acquittal).
 
 
 8
 After our reinstatement of Santos's conviction, the Appellate Division considered Santos's remaining claims on appeal. The Appellate Division again reversed Santos's conviction, finding that he was denied effective assistance of counsel. People of the Territory of Guam v. Santos, 856 F. Supp. 572, 573 (D. Guam App. Div. 1994). The Appellate Division further noted that although it did not have to reach the issue of prosecutorial misconduct, it shared the view of the Superior Court that "many of the prosecutor's comments at trial were inappropriate," and it "admonished" the government to "refrain from such conduct during the re-trial of this case." Id.
 
 
 9
 The government of Guam now appeals the Appellate Division's latest reversal of Santos's conviction.
 
 B. FACTS
 
 10
 On January 2, 1987, the bodies of Mike Weis and Rose Perez were discovered at the Brass Lantern Lounge in Guam. They had been stabbed to death. There were no charges filed in the murders until October 1987, when Santos and co-defendant John Salas Cruz were indicted. Santos was tried and convicted in December 1987.
 
 
 11
 At Santos's trial, the only witness placing him at the scene of the murders was government witness Baleria "Esther" Mariur Borja Lujan, a woman who had been a bartender at the Brass Lantern until about two months before the murders. The government and defense stipulated that there was no physical evidence of Santos's presence found at the scene of the murders. A technician from the Guam crime lab testified that several of the fingerprints collected at the murder scene belonged to the victim, Mike Weis, but that there were also a number of fingerprints collected at the scene which were not identified. RT II at 113.
 
 
 12
 Santos was represented by court-appointed trial counsel prior to and during trial. The government provided Santos's counsel with certain discovery materials before trial. Among those materials was an internal Guam police department memorandum, dated August 17, 1987, written by Lieutenant Leon Guerrero. Guerrero stated in the memorandum that he had received information from a confidential informant that Eddie Lujan and two Palauan females, one by the name of Esther, were involved in the Brass Lantern homicides.[1]
 
 
 13
 In an affidavit accompanying Santos's new trial motion, his court-appointed counsel stated that he reviewed the memorandum, put an asterisk on it, and wrote "check this out" in the top corner. ER at 4. Trial counsel then put the document in a discovery file labeled "important." ER at 5. Nothing further was done. In the affidavit, trial counsel stated that he forgot about the memorandum until he heard the government's closing rebuttal argument. Id. Trial counsel also stated in his affidavit that he was aware that Eddie Lujan had a prior conviction for murder. ER at 4. Eddie Lujan is Esther Lujan's ex-husband. RT I at 144. Esther was in the process of divorcing Eddie Lujan during the time she worked at the Brass Lantern. Id. At the time of the murders, she was not living with Eddie, but he sometimes stayed with her. RT I at 167.
 
 
 14
 Esther Lujan testified at trial that Santos's trial counsel had "represented [her] in some cases." RT at 48. On direct examination, the prosecutor asked Esther Lujan if she knew Santos's trial counsel "very well." She replied: "Yes. He's a nice person. I--when I felt like I had a question or I was counselled[2] about something, I would call him up and ask him if he can advise me." Id. On cross-examination, trial counsel brought out that he had represented Esther in a divorce and an immigration matter. RT I at 143.
 
 
 15
 According to Esther Lujan, the murders took place as follows. Lujan went out cruising in her car on New Year's Day 1987 with no particular purpose in mind. She decided to try to track down John Salas Cruz (whom she knew by his nickname John "Kalaskas"), because she wanted to give him a message from Palau, which she had just visited over Christmas. RT I at 60. She ran into John with Henry Santos at Nimitz Beach. Esther Lujan testified that she had dated Henry Santos for about a year when she was a teenager (Lujan was thirty years old when she testified at trial), but that she hadn't had much contact with him since then.
 
 
 16
 Esther Lujan also testified that she, Cruz and Santos spent the evening cruising around, drinking beer. At about two a.m., Lujan decided to stop by the Brass Lantern. She had worked at the Brass Lantern from about July 1986, until the end of October 1986, but quit when she decided to travel to Palau for a month. She testified that she went to the Brass Lantern on the night of the murders because she wanted to tell Mike Weis, the manager, that she was returning to work. Lujan testified that when she told Cruz and Santos that she was going to drive over to the Brass Lantern, they said to each other in Chamorro: "There's a lot of marijuana there."
 
 
 17
 According to Lujan, Mike Weis let her enter the restaurant, which had closed for the night. A few minutes later, Santos and Cruz came in, and they attacked and stabbed Weis and Rose Perez (Perez was Weis's girlfriend, who had been asleep in the back room when Lujan and her friends arrived). Lujan stated that she stood there and watched in astonishment as the whole thing occurred. Lujan further testified that after Weis and Perez were dead, Cruz and Santos wiped down most of the surfaces in the bar and backroom and then stole the cash in the cashbox, as well as about $1000 to $1500 worth of marijuana. RT I at 106. Lujan's description of how the stabbings occurred and other details of the crime matched the forensic evidence offered at trial.
 
 
 18
 Lujan testified that she then drove Santos and Cruz home, and that they gave her about $100 worth of marijuana. Lujan did not tell the police her account of what had happened until October 1987. She said she was motivated to come forward then because after an overdose of heroin, she had begun to have nightmares. RT I at 136. Lujan also testified that Harry Carriaga, her heroin supplier, threatened her after her overdose and that because of that threat she went to the police, and eventually told them the story of her involvement in the Brass Lantern murders. RT I at 130-131.
 
 
 19
 There were various incidents related by Lujan during her testimony that showed she has often been motivated by vindictiveness. First, Lujan testified that she decided she would "get" Harry Carriaga, a man whom she said caused her to overdose on heroin. RT I at 154. She then went to the police and told them that Carriaga was a heroin dealer, and set up a controlled buy with him. Id.
 
 
 20
 Second, Esther Lujan testified that she lied to Lt. Perez of the Guam Police Department. Lujan stated that she took Lt. Perez out to a rural area where she told him that evidence of the murders was hidden even though she knew there was no hidden evidence there. RT II at 6. Lujan explained that she led the police on a false trail to get back at them because they were pressuring her to be involved in another controlled buy which she did not want to participate in. Id.
 
 
 21
 Esther Lujan testified to yet another incident of vindictiveness. On direct examination, she stated that her impetus for turning in Henry Santos to the Guam police was that he allegedly told Lujan's friend to stay away from her.[3]
 
 
 22
 The Guam police gave Lujan $700 in cash and a roundtrip ticket to Hawaii after she came to them with her story of the murders. RT I at 139. The police had already been paying her utility bills (about $100 a month) for her work in making controlled heroin buys. RT II at 4.
 
 
 23
 In July 1989, Esther Lujan and Eddie Lujan, along with numerous other defendants, were named in an indictment charging heroin and marijuana distribution in Guam between 1984, 1987. CR 27 at 2 (Memorandum of Points and Authorities in Support of Motion for Release Pending Appeal). In December 1989, when Santos filed the Motion for Release Pending Appeal, Esther Lujan was still at large.
 
 
 24
 At Santos's trial, the government also presented the testimony of Guam police officer Gregorio Perez. Perez testified that he was on duty guarding the crime scene the morning after the murders and that Henry Santos showed up at the scene. According to Perez, Santos was drunk and acting obnoxious. Santos kept trying to gain entrance to the crime scene, saying "my brother's girlfriend works there."[4]
 
 
 25
 Perez also testified that he had known Henry Santos for about fifteen years because they grew up in the village of Agat together. RT III at 96. Perez stated on direct examination that, in Henry Santos's efforts to gain admission to the crime scene, Santos stated: "I'm responsible for killing those individuals." RT III at 97. Perez told the jury that he didn't take Santos's statement seriously, stating: "Knowing Henry, he was just trying--probably tried to be the center of attraction; but, you know, I just don't believe he's responsible for that." RT III at 98.
 
 
 26
 Perez arrested Santos that morning for obstruction of a government operation. Perez testified that when he cuffed Santos, Santos said to him "I am going to kill you," but that Santos was laughing when he said it. RT III at 98. Perez stated further: "He [Santos] tries to measure me every time I responded to a disturbance and he was the individual that's supposed to be responsible .... [H]e measures me from tip to--from toe to head." RT III at 99.
 
 
 27
 Perez wrote up a police report after his arrest of Santos that day. But Perez did not mention in the report any of Santos's statements, including the "confession." Perez stated that he didn't take Santos's statement seriously because, based on his knowledge of Santos, he thought Santos was just saying that he did the murders so that he could be the center of attention.[5] RT III at 100.
 
 
 28
 In December 1987, right before trial and nearly a year after the murders, Officer Perez supplemented his police report to include the alleged incriminating statements Henry Santos made to him. RT III at 114.
 
 II. ANALYSIS
 A. INEFFECTIVE ASSISTANCE OF COUNSEL
 
 29
 We review a claim of ineffective assistance of counsel de novo. United States v. Swanson, 943 F.2d 1070, 1072 (9th Cir. 1991). "Claims of ineffective assistance of counsel may be raised on direct appeal when the record is sufficiently developed to permit the reviewing court to resolve the issue, or when assistance is so inadequate that it obviously interferes with a defendant's Sixth Amendment right to counsel." United States v. Daly, 974 F.2d 1215, 1218 (9th Cir. 1992) (citations omitted). As our analysis below makes clear, there is sufficient evidence on the record before us to resolve Santos's ineffective assistance claim on this direct appeal.
 
 
 30
 To prove ineffective assistance, Santos must demonstrate that (1) his court-appointed trial counsel's performance fell below an objective standard of reasonableness, and that (2) he was prejudiced by his trial counsel's performance. Strickland v. Washington, 466 U.S. at 687-690.
 
 
 31
 We agree with the trial court and the Appellate Division that Santos has met the first prong of the Strickland test here. The government of Guam also concedes that trial counsel's performance fell below the standards of professional competence. Bl. brief at 8.
 
 
 32
 We also agree with the Appellate Division that Santos was prejudiced by his trial counsel's failure to investigate the police memorandum implicating Esther and Eddie Lujan, or seek to make use of it during trial. The focus of the prejudice inquiry is whether counsel's performance "renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 113 S. Ct. 838, 844 (1993). Here we conclude that because of defense counsel's deficient performance, the result in Santos's trial was clearly unreliable.
 
 
 33
 Esther Lujan was the only government witness who placed Santos at the scene. Evidence on the record amply demonstrates that she is an impulsive woman who played games with the police (i.e., the wild goose chase she sent them on to look for evidence she knew did not exist) and who turned people into the police when she had a grudge against them (e.g., turning in Harry Carriaga after she overdosed on heroin that he gave her; also, not telling the police her story of Henry Santos's involvement in the murders until after Santos allegedly told a friend of hers to stay away from her).
 
 
 34
 There was no physical evidence tying Santos to the murders. Santos's court-appointed trial counsel was in possession of a memorandum which cast serious doubt upon the credibility of Esther Lujan, the witness upon whom the government's entire case was built. Yet Santos failed to cross-examine Esther on the theory that she was the perpetrator of the murders.
 
 
 35
 If Santos's trial counsel had used the memorandum to discredit Esther's testimony or to raise an alternative theory about who was responsible for the Brass Lantern murders, then the government's thin case against Henry Santos could have evaporated. We can say with confidence that Santos had to be prejudiced by his counsel's complete failure to even remember that the internal police memorandum existed until his memory presumably was jogged by the government's closing rebuttal argument. Accordingly, we affirm the order of the Appellate Division reversing Santos's conviction and remanding for a new trial.
 
 B. PROSECUTORIAL MISCONDUCT
 
 36
 During the government's closing argument, the prosecutor stated: "If I didn't believe the truth was that Henry Santos did it, I wouldn't be here." ER at 115. Defense counsel objected to the remark, and the trial court sustained the objection, stating: "The jury will disregard the remarks of the counsel for the government's feelings of whether she thought he was guilty or not guilty, she would be here. So just disregard that." ER at 115-116.
 
 
 37
 The prosecutor then responded by saying: "[R]emember the roles of the parties .... [T]he government is serving on behalf of the people for the truth in this case and to prosecute criminals, people who commit murders. Defense counsel represents the defendant where he can get him acquitted. His desire is to have you find him not guilty.... I have been honest with you from the beginning." ER at 116. The defense did not object to these comments.
 
 
 38
 During the direct examination of Esther Lujan, the prosecutor repeatedly tried to elicit from her what it was that Harry Carriaga said that made her so scared. Santos's trial counsel objected repeatedly, on the ground that what Carriaga told Lujan was inadmissible hearsay. RT I at 54-55, 130. The court sustained the hearsay objection. During closing argument, the prosecutor stated to the jury: "You don't know what [Carriaga] said to her, but she says she thought she was going to be killed." RT V at 76.
 
 
 39
 Because we reverse Santos's conviction on his ineffective assistance claim, it is unnecessary for us to decide Santos's claim of prosecutorial misconduct. We share the view of the Superior Court and the Appellate Division, however, "that many of the prosecutor's comments at trial were inappropriate" and we agree with the Appellate Division that the prosecution "should refrain from such conduct during the re-trial of this case." Santos, 856 F. Supp. at 573.
 
 III. CONCLUSION
 
 40
 We AFFIRM the judgment of the Appellate Division reversing Santos's conviction and remanding for a new trial on the ground that Santos was denied effective assistance of counsel.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of the Circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 The memorandum reads as follows:
 At 6:30 p.m., 8/14/87, I received information from CPI #87-051 that he has come across information identifying Eddie Lujan and two female individuals believed to be Palauans one by the name of Esther and another unidentified to be involved in the Brass Lantern Homicide.
 ER at 3.
 Lujan testified at trial that she is a native of Palau, and that her nickname is Esther. SER at 10-11.
 
 
 [2]
 Esther Lujan may have meant "confused" and not "counselled" here. Her English is not always precise
 
 
 [3]
 During direct examination, the prosecutor asked Esther why, when she first went to the police with her account of the Brass Lantern murders, she did not mention John Salas Cruz's involvement. Esther replied that she did not mention Cruz because he was not around on Guam at the time. The prosecutor then asked the following question: "So why did you tell about Henry; why is his situation different?"
 Lujan's answer: "Because he was there. I saw him recently and the thing that got to me is he told the--a friend of his who's a friend of mine to stay away from me, not to be talking to me. I don't know why he told him [the friend] that." RT I at 141 (emphasis added).
 
 
 [4]
 Santos's brother Ivan testified that his then-girlfriend, Antoinette Abay, worked at the Brass Lantern and that he would often hang out with her there until she finished work. Abay's testimony corroborated this
 
 
 [5]
 The prosecution presented other testimony which corroborates that Henry Santos was not acting out of character on the day after the murders. Without any objection from defense counsel, Officer Rabon, one of the police officers at the crime scene, stated during the government's case-in-chief: "He [Santos] has been known to have a combative attitude.... He is well-known for getting into fights and having a real combative, belligerent attitude toward police officers." RT I at 34